UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| VALARIE L. MORGAN,                     ) | |
|                                                            ) | |
|     Plaintiff,                                       ) | |
|                                                            ) | |
|         v.                                               ) | CAUSE NO.  1:09-cv-0442-WTL-TAB |
|                                                            ) | |
| MICHAEL J. ASTRUE,                    ) | |
| Commissioner of Social Security   ) | |
|                                                            ) | |
|     Defendant.                                    ) | |

## ENTRY ON JUDICIAL REVIEW

Pursuant to 42 U.S.C. § 405(g), Plaintiff Valarie L. Morgan seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Insurance Benefits ("SSI") under Titles II and XVI of the Social Security Act ("the Act").  The Court, having reviewed the record and the briefs of the parties, rules as follows.

## PROCEDURAL HISTORY

Morgan filed her application on February 15, 2006, alleging disability beginning on January 21, 2006, due to mental illness and pain caused by fibroid tumors.  Morgan's application was denied initially and upon reconsideration, whereupon she requested and was granted a hearing before Administrative Law Judge ("ALJ").  A hearing was held on September 25, 2008, before ALJ James Norris at which Morgan testified.  Also testifying were medical expert Julian J. Freeman, M.D., an internist, psychological expert Donald A. Olive, Psy. D., a licensed clinical psychologist, and Ray Burger, a vocational expert.  The ALJ denied Morgan's application for benefits on October 10, 2008.  The Appeals Council denied review of the ALJ's decision on

March 4, 2009, making it the final decision of the Commissioner.  Morgan then filed this action seeking review of the Commissioner's decision.

## FACTUAL HISTORY

Morgan was 34 years old when she filed her application for benefits. Morgan is a high school graduate and has completed two years of technical college.  Her past relevant work was primarily as an assembler.  She worked as an assembler for approximately eight years until 2003 when the factory at which she was employed closed.  Morgan is also a singer, and in 2003 she released a CD of her songs.  Morgan worked for a short time in 2005 and 2006 at a fast food restaurant but reports that she was told to stop working by her physician.  She also worked for a time in 2007 and 2008 at a convenience store and a restaurant.  Apparently her earnings from these jobs were too low to qualify as substantial gainful activity, as the ALJ found that she had not engaged in substantial gainful activity since her alleged disability onset date of January 21, 2006.

### *Physical Health Records*

Morgan suffered from painful fibroid tumors and other complications, including mild pancreatitis and anemia, during her pregnancy in 2006.  She underwent two post-pregnancy surgeries to remove multiple, large uterine fibroid tumors.  Morgan reports that she experiences pain from fibromyalgia in her shoulder, neck, back, buttocks, the back of her legs, her feet and at times her hands.  Morgan also reports internal cystitis.

In December 2007, Morgan began treatment for chronic pain with Dr. Neal Coleman at Ball Memorial Hospital.  Morgan reported pain and numbness in her lower back, buttocks, legs and feet, as well as carpal tunnel syndrome.  She had been undergoing physical therapy, which

had not been successful in treating her pain.  Over the next several months Dr. Coleman administered injections and prescribed duragesic patches and other medication in an attempt to alleviate her chronic pain.  He diagnosed the following:  pain in the thoracic spine; cervicalgia; lumbago; central pain syndrome; chronic pain; and long term use of high-risk medication.

### *Mental Health Records*

Morgan has a long history of depression, panic and anxiety for which she has been prescribed numerous medications.  Morgan has been treated at the Center for Mental Health ("CMH") for major depression, anxiety disorder and panic disorder with agoraphobia.  Morgan first went to CMH in the early 1990's due to work-related stress and apparently was also treated there for depression in 2003 and 2004.  The record indicates that she began treatment with Dr. Kuhs at CMH in January 2005.  Dr. Kuhs' initial impression was that she was being treated with medication to help with performance anxiety relating to her singing career and that the symptoms that she reported likely were side effects from those medications.  He therefore changed her medication, prescribing Inderal, a beta blocker commonly used to decrease performance anxiety, and Xanax, and anti-anxiety medication that she apparently had been taking for some time.  A few weeks after her first appointment with Dr. Kuhs, Morgan came in for an emergency visit.  At that time she was dealing with a "crisis" with her husband.  Dr. Kuhs prescribed Ambien (a sleeping pill) and Lexapro (a drug used to treat depression and anxiety) to help her through the crisis period.  Dr. Kuhs noted that the medication he prescribed at her previous appointment had been working well for her performance anxiety.  By June 2005 Dr. Kuhs reported that Morgan was stabilized on her medications.

Morgan had numerous subsequent visits to CMH for "medication checks."  At times her doctors expressed concern that she was taking more Xanax than had been prescribed.  In June 2006, she reported that her obstetrician had prescribed Wellbutrin for post-partum depression after the birth of her baby; her CMH physician continued that prescription along with Lexapro, Inderal, Xanax, and Ambien.

Morgan began counseling sessions at CMH in July 2006, reporting panic attacks, depression and anxiety.  A diagnosis-multiaxial assessment noted the following:  AXIS I:  Major Depression Disorder Recurrent- Moderate, Generalized Anxiety Disorder; and Panic Disorder with agoraphobia; AXIS II:  Deferred;  AXIS III: No Entry; AXIS IV:  Economic problems, primary support group problems; and Axis V: GAF 52.  A January 2007 assessment was essentially identical.  In February 2008 she was assessed as follows:  AXIS I:  Bipolar Disorder Most Recent Episode Unspecified, Generalized Anxiety Disorder, and  Panic Disorder Without Agoraphobia; AXIS II:  Personality Disorder NOS; AXIS III:  No entry; AXIS IV:  Economic problems, Occupational Problems, Other Psychosocial Problems; AXIS V: GAF 45.

Between July 2006 and July 2008 Morgan attended group therapy sessions at CMH more than thirty times.  Records from her therapists indicate that Morgan's disposition varied from session to session.  At times she was very cheerful and expressive.  For instance, at the therapy session held on July 17, 2006, Morgan was very expressive and even showed humor throughout the meeting.  At other therapy sessions she was tearful and did not participate. On July 30, 2007, she began therapy in a positive mood and then later became so emotional that she sobbed uncontrollably and refused to participate for the rest of the session.  Regardless of her mood, Morgan frequently rated her anxiety and depression as being between seven and nine on a scale

4

of one to ten.  She stopped participating in group therapy for a time in mid-2007, reporting that she felt "too overwhelmed" to attend.  At a July 2007 medication check she reported that she had a new job but that she experienced panic attacks as a result.  At her request, she was given a note stating that she needed to take a week off work due to anxiety.  Her GAF was assessed at 50.  Shortly thereafter she returned to group therapy.

During an August 2007 medication check Morgan reported that she was feeling paranoid and felt as if someone was following her.  Dr. Gregory Richardson prescribed an additional medication, Abilify, which is an antipsychotic.

In February 2008 a psychological evaluation was conducted by Dr. Jane Grandison, a clinical neuropsychologist at Ball Memorial Hospital.  This evaluation was conducted in conjunction with Morgan's treatment at a pain management center.  Morgan was referred to Dr. Grandison "for a psychological evaluation to assist in treatment planning for chronic pain and to assist in determining the presence and evaluation of any psychological factors that might affect [her] pain management."  Record at 1139.  Grandison administered the MMPI-II test and reported the following:

> She had an extremely elevated F score and relatively low VRIN scale score that suggests that her endorsement of extreme ideas is a result of careful item responding rather than a random response pattern.  She apparently understood the test, the item content and endorsed the symptoms as descriptive of her currently [sic.] functioning.   Her self-description is extremely disturbed, requires further consideration because she claimed many more extreme psychological symptoms than most patients do.  Several possibilities require further evaluation.  It is possible she is exaggerating her symptoms in order to gain attention of services.  Sometimes an individual involved in litigation will produce this exaggerative profile in order to show a particular pattern of symptoms.  If an exaggerated response can be ruled out based on live circumstances it may be that her extreme responding is a result of unusually severe psychological problems.  The possible reason for exaggerated responding requires further evaluation again.

> Some patients being evaluated in the medical setting produce extremely elevated F scale scores as a result of confusion or disorganization related to their medical condition.  There is some possibility that the clinical report is an exaggerated picture of the client's present situation and problems.  She is presenting an unusual number of psychological symptoms.  This response could result from poor reading ability, confusion, disorientation, stress or need to seek a great deal of attention for her problems.  A severe psychological disorder is reflected in his [sic.] profile.  The client appears to be experiencing a florid psychotic process that includes personality decompensation, social withdrawal, disordered affect, and erratic, possibly a faulty behavior.   She appears to be quite confused, withdrawn and preoccupied with abstract ideas.  She may feel that others are against her because of her beliefs. She may be quite apathetic and tends to spend a great deal of time in fantasy and might suffer from hallucinations, blunted or inappropriate affect and hostile, irritable behavior.  Again, she appears confused and disoriented.  She may behave in unpredictable highly aggressive ways.  Personality decompensation, disorganization and thought disorder are likely to persist.

*Id.* at 1140.  She further stated that Morgan "appears to have symptoms that suggest schizophrenia, possibly paranoid and/or delusional type." *Id.* at 1141.  Her diagnosis was: AXIS I:  Pain disorder associated with those psychological factors in general medical condition.  Rule out schizophrenia; AXIS II:  Deferred; AXIS III:  Chronic pain, hypertension, acid reflux, allergies, sleep disorder, anxiety, depression, panic disorder, bladder disorder and nausea; AXIS IV: Chronic pain, mental problems, possible schizophrenia, possible marital conflict; AXIS V GAF 40.  Grandison recommended that Morgan continue her treatment at CMH and receive further psychiatric evaluation to address her medications.

Also in February 2008 a "Affective Disorders" form was completed by Jeannette Freestone, MSN, LNP, of CMH.  She opined that Morgan had "moderate" restrictions of daily living and difficulties in maintaining social functioning and "marked" difficulties in maintaining concentration, persistence or pace.  She had had three episodes of decompensation of extended duration and her activities were markedly limited by her anxiety.  Her depression was

characterized by: anhedonia, appetite disturbance, sleep disturbance, psychomotor agitation, decreased energy, and difficulty concentrating, but she did not suffer from thoughts of suicide, hallucinations, delusions or paranoid thinking. On the same form, Morgan's primary therapist, Emily Williamson, MSW, LSW, added the following note: "I concur with these ratings and add the symptom of 'feelings of worthlessness.' I would add that Valarie has recently decompensated to having marked limitation pertaining to ADL's." *Id.* at 953.

During a May 2008 medication check visit at CMH, her Abilify was discontinued due to side effects and Lexapro was discontinued because Morgan reported she had not been taking it. The mood stabilizer Geodon was prescribed.

### *Consultative Examinations*

In April 2006 Morgan was referred to Carrie Dixon, Ph.D., for a psychological evaluation and mental status examination in conjunction with her application for disability benefits. Dr. Dixon's diagnoses were as follow: AXIS I: Major Depression, mild, complicated with pregnancy issues; AXIS II: No diagnosis; AXIS III: Complicated pregnancy, high blood pressure, allergies, fibroids; AXIS IV: Unemployed, family relationship problems, inadequate social support; AXIS V: Current GAF = 55 (current). Dr. Dixon determined that Morgan was capable of managing her own funds, exhibited "signs of good reality contact" and fair memory skills, and was able to perform simple calculations.

In December 2006 Dr. Joseph Pressner, a state agency psychologist, examined Morgan's records and opined that Morgan suffered from affective disorder, anxiety disorder, and pain attacks. Dr. Pressner completed a form on which he rated Morgan's functional limitations as mild restrictions of daily living; moderate difficulties in maintaining social functioning and

maintaining concentration, persistence or pace and no episodes of decompensation of extended duration. He also found her to be markedly limited in her ability to interact appropriately with the general public and to travel in unfamiliar places and moderately limited in the following: ability to "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances"; ability to work in coordination with or proximity to others without being distracted by them; "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods"; and ability to set realistic goals and make plans independently. Dr. Pressner concluded as follows:

> [T]he claimant appears to be somewhat anxious around others. Thus the claimant could not work with the general public or in jobs which require intensive, interpersonal contact with others. The claimant would appear to work best alone, in semi-isolation from others or as part of a small group. The claimant could work with a supervisor who was normally considerate and positive, but would have problems with a supervisor who was often negative, critical or quarrelsome.
>
> The claimant's pace would be within normal limits except as limited by the claimant's physical problems. It is possible that there would be interruptions at times from panic attacks, but these are infrequent and of short duration, and thus would not prohibit employment. The claimant should be able to attend to task for a two hour period of time. It appears that the claimant is capable of maintaining a schedule. However, it is possible that she would have some problems with tardiness since she finds it difficult (although not impossible) to leave her home.
>
> Thus although the claimant has a severely limiting condition, it appears that the claimant retains the ability to perform simple, repetitive tasks on a sustained basis without extraordinary accommodations.

*Id.* at 202.

A psychiatric review was completed by psychologist Susan Spencer on June 12, 2008. She determined that Morgan suffered from schizophrenia, bipolar disorder, anxiety disorder and panic disorder without agoraphobia. She assessed a GAF of 40 and remarked that Morgan was

"unable to manage her own funds due to erratic behavior secondary to emotional status." *Id.* at 600. Dr. Spencer opined that Morgan was mildly impaired in carrying out simple instructions; moderately impaired in understanding and remembering simple instructions, making judgments on simple work-related instructions, and interacting with the public, supervisors, and co-workers; markedly impaired in understanding and remembering complex instructions and responding appropriately to usual work situations and changes in a routine work setting; and extremely impaired in carrying out and making judgments on complex work-related decisions. Dr. Spencer administered an MMPI-II test, the results of which were considered "not a valid indicator of [Morgan's] personality and symptoms":

> The client responded to the MMPI-2 items in an extremely exaggerated manner, endorsing a wide variety of rare symptoms and attitudes. These results may stem from a number of factors that include excessive symptom checking, falsely claiming psychological problems, low reading level, a plea for help, or a confused state.

*Id.* at 608. Dr. Spencer noted that "[i]f interpreted, this profile would indicate the client was truthful in her responses, that she has low self-esteem and did not exaggerate when she rated herself negatively." *Id.* at 598.

## APPLICABLE STANDARD

Disability is defined as "the inability to engage in any substantial gainful activity by reason of a medically determinable mental or physical impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of at least twelve months." 42 U.S.C. § 423(d)(1)(A). In order to be found disabled, a claimant must demonstrate that her physical or mental limitations prevent her from doing not only her previous

work, but any other kind of gainful employment which exists in the national economy, considering her age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner employs a five-step sequential analysis. At step one, if the claimant is engaged in substantial gainful activity she is not disabled, despite her medical condition and other factors. 20 C.F.R. § 404.1520(b). At step two, if the claimant does not have a "severe" impairment (i.e., one that significantly limits her ability to perform basic work activities), she is not disabled. 20 C.F.R. § 404.1520(c). At step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, App. 1, and whether the impairment meets the twelve-month duration requirement; if so, the claimant is deemed disabled. 20 C.F.R. § 404.1520(d). At step four, if the claimant is able to perform her past relevant work, she is not disabled. 20 C.F.R. § 404.1520(f). At step five, if the claimant can perform any other work in the national economy, she is not disabled. 20 C.F.R. § 404.1520(g).

In reviewing the ALJ's decision, the ALJ's findings of fact are conclusive and must be upheld by this court "so long as substantial evidence supports them and no error of law occurred." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *id.*, and this court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). The ALJ is required to articulate only a minimal, but legitimate, justification for his acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). In order to be

affirmed, the ALJ must articulate his analysis of the evidence in his decision; while he "is not required to address every piece of evidence or testimony," he must "provide some glimpse into [his] reasoning . . . [and] build an accurate and logical bridge from the evidence to [his] conclusion." *Id.*

## **DISCUSSION**

The ALJ found at step one that Morgan had not engaged in substantial employment since her alleged onset date of January 21, 2006. At step two, the ALJ concluded that Morgan's severe impairments included depression and anxiety. At step three, the ALJ concluded that Morgan did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. At step four, the ALJ concluded Morgan had the residual functional capacity to perform work at all exertional levels, but that she had nonexertional limitations that permit the performance of no more than simple, repetitive work that does not require working with the general public. Accordingly, he found that Morgan could perform her past relevant work as an assembler. Assuming "for the sake of argument" that she could not, the ALJ performed the step five analysis and found that, considering Morgan's age, education, work experience and residual functional capacity, she was capable of performing a significant number of jobs in the national economy, including janitor-cleaner and maid. Therefore, the ALJ determined that Morgan was not disabled.

Morgan advances several objections to the ALJ's decision, each of which is addressed below.

### *ALJ's Dismissal of Morgan's Allegation of Disabling Pain*

Morgan alleges that she suffers from disabling pain. As noted above, she has been

diagnosed with and treated for chronic pain with various prescription medications, injections, and physical therapy. She was also referred to clinical neuropsychologist Dr. Grandison to determine whether there were any psychological factors related to her pain. Dr. Grandison diagnosed Morgan with a pain disorder with psychological factors. Consistent with this diagnosis, medical expert Dr. Freeman testified that Morgan's complaints of pain "appear to be physical manifestations of psychiatric illness that is otherwise evident." Record at 1151.

Morgan argues that the ALJ failed to properly address Morgan's allegation of disabling pain. The Court agrees. The ALJ found that once her pregnancy ended and her fibroid issue was resolved with surgery, Morgan did not have a physical impairment that was likely to cause pain. This finding is supported by substantial evidence in the form of the testimony of Dr. Freeman, and Morgan does not dispute that fact. However, as Morgan points out, in spite of the consistent evidence in the record that Morgan experiences pain that has a psychological, rather than a physical, cause, the ALJ wholly failed to address that possibility. The ALJ did not address the issue with the psychological expert at the hearing and did not mention it in his decision. The failure to do so was error and requires remand.[1]

### *Lack of Substantial Evidence*

Morgan also argues that the ALJ's decision was not supported by substantial evidence in several respects. First, she objects to the fact that the ALJ "relied heavily" on the December 2006 Mental Residual Functional Capacity Assessment ("MRFCA") prepared by state-agency

---

[1] Morgan also notes that the ALJ failed to consider the effects of her chronic pain in combination with her mental illness, which is not surprising in light of the fact that the ALJ did not find that she suffered from chronic pain. Obviously if the ALJ finds on remand that Morgan does suffer from some level of pain, he should consider that pain in combination with her other psychological symptoms to determine whether those symptoms combined are disabling.

psychologist J. Pressner even though he did not have the benefit of Morgan's more recent medical records which, Morgan asserts, demonstrate that her psychological condition has worsened since December 2006. However, as the Commissioner points out, the ALJ actually adopted the limitations identified by psychological expert Dr. Olive, who did have the opportunity to review the entire medical record prior to his testimony at the hearing, including the later medical records to which Morgan points. It was unnecessary for the ALJ to obtain an updated report from Dr. Pressner when he had a psychological expert present at the hearing.

Morgan also argues that the ALJ failed to incorporate all of the limitations supported by the record into the hypothetical question he posed to the vocational expert. Morgan points to various limitations included in Dr. Pressner's MRFCA that the ALJ did not include in his own RFC, as well as limitations found by consultative psychologist Dr. Spencer. The fact is, however, that an ALJ is "required only to incorporate into his hypotheticals those impairments and limitations that he accepts as credible," *Schmidt v. Astrue,* 496 F.3d 833, 846 (7th Cir. 2007), and the ALJ chose to rely upon the testimony of psychological expert Dr. Olive.

With regard to the testimony of Dr. Olive, Morgan argues that the ALJ's examination of him involved only "leading and very narrow questions" that failed to elicit a complete assessment of Dr. Olive's opinions regarding Morgan.

"While a claimant bears the burden of proving disability, the ALJ in a Social Security hearing has a duty to develop a full and fair record." *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009). Where, as here, the claimant is not represented by counsel,[2] the "duty is enhanced" and the ALJ must "scrupulously and conscientiously probe into, inquire of, and explore for all

---

[2]While Morgan is represented by counsel on appeal, she appeared at the hearing before the ALJ with a non-attorney representative.

13

the relevant facts." *Id.* (citations and internal quotation marks omitted).  However, "the reasoned judgment of the Commissioner on how much evidence to gather" is generally upheld, even when the claimant is *pro se*. *Id.*  Accordingly,

> a significant omission is usually required before this court will find that the Commissioner failed to assist pro se claimants in developing the record fully and fairly.  And an omission is significant only if it is prejudicial.  Mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand.  Instead a claimant must set forth specific, relevant facts-such as medical evidence-that the ALJ did not consider.

*Id.* (citations and internal quotation marks omitted).

Morgan argues that the ALJ failed to ask Dr. Olive whether he agreed with all of the limitations prescribed by Dr. Pressner in his MRFCA.  However, the ALJ did elicit testimony from Dr. Olive regarding his own opinion of Morgan's RFC, and therefore Morgan was not prejudiced by the ALJ's failure to ask Dr. Olive to critique Dr. Pressner's opinion.

The ALJ included in his RFC–and in his hypothetical question to the vocation expert–limitations consistent with the testimony of Dr. Olive, with one exception.  Dr. Olive testified that an employer "would hopefully need to take into account to some extent, some tardiness" because of Morgan's "intermittent" and "infrequent" fear of leaving her home. Record at 1163-64.  The ALJ did not mention this limitation in either his RFC or his hypothetical question and did not inquire of Dr. Olive how "infrequent" he believed she would be tardy or absent from work because she had difficulty leaving her home.  Nor did he address the issue in his decision.  Because the need for excessive tardiness and/or absences from work can make a person unemployable,[3] the ALJ should have addressed the issue.  This omission should be

---

[3]Upon questioning by Morgan's non-attorney representative, the vocational expert testified that an employee missing work twice a month due to psychological symptoms would be unacceptable to an employer.

corrected on remand.

Finally, Morgan objects to the ALJ"s rejection of evidence that supports her claim that her mental condition is disabling in favor of evidence that suggests otherwise. The ALJ's evaluation of the evidence of record actually was quite thorough, and his decision articulates his reasons for crediting the opinions of certain medical care providers and consultants over others.[4] Morgan is essentially asking the Court to reweigh the evidence, which it may not do. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). That said, however, the Court agrees with Morgan with regard to two aspects of the ALJ's decision. First, with regard to Morgan's invalid MMPI-II test results, the ALJ adopted what he describes as the "alternate conclusion" of Dr. Grandison–that Morgan purposefully exaggerated her symptoms "in order to gain the attention of services." Record at 21. The trouble is that while Dr. Grandison stated that was one possible explanation for Morgan's scores, she did not opine that it was the true, or even likely, explanation; nor did Dr. Spencer, or Dr. Olive, or any other doctor of record. In other words, there is no medical opinion in the record to support the ALJ's finding regarding Morgan's MMPI-II results. Rather, all of the physicians who commented on the matter seem to agree that further evaluation is necessary to determine the reason for the unusual results.

Also troublesome is the fact that in discounting Morgan's self-reporting of her symptoms and the opinions of the various medical professionals who credited them, the ALJ seems to rely heavily upon a single note taken by a disability caseworker who interviewed Morgan's husband over the telephone shortly after the birth of her child. That note reads:

> Spoke with claimant's husband in order to get updated ADL info now that she's had the baby. He said she bathes and changes clothes regularly. She helps out

---

[4]This includes his finding that Dr. Spencer's opinion was not entitled to any weight.

> with some of the cooking and cleaning, but she's pretty busy taking care of the baby so her husband does most of that. She feeds the baby and changes its diaper several times a day. She watches TV when able in between tasks, for about 4 hours per day. Her husband said she is able to concentrate unless she's too tired from taking care of the baby. He is still doing most of the grocery shopping because she prefers to stay at home with her newborn. She does have a few friends that she talks on the phone with. He said she gets along okay with others. He said she can get moody sometimes, but the moods aren't as bad since she's not in as much pain anymore. She is glad to be able to do more things on her own again now that she's not in as much pain. Her husband said he still feels like he "is her backbone" and he still has to help out with the heavier things around the house right now until she heals completely since having the baby. When asked about her depression, he did not notice any crying episodes recently and said she is mainly just tired from taking care of the baby. He said she does attend church occasionally and will visit with friends when she has a chance.

Record at 373. It is somewhat perplexing why the ALJ would give this third-hand account of Morgan's condition in May 2006 more credence than the multitude of therapy notes and medical records from the months (and years) following. Upon remand, the ALJ should consider whether it is appropriate to do so and, if he believes it is, explain why.

Finally, Morgan argues that the ALJ erred in failing to acknowledge and address the credibility of the statement in the record of her mother, Augustine Fairley, regarding Morgan's condition. However, an ALJ "is not required to address every piece of evidence or testimony" in his decision, *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004), and it was not error for him to omit discussion of Fairley's statement, which essentially corroborated Morgan's testimony about her condition. *See Books v. Chater*, 91 F.3d 972, 980 (7th Cir. 1996) (finding that the ALJ did not err in failing to discuss the testimony of the claimant's brother, as testimony served only to reiterate and corroborate the claimant's testimony); *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (finding that the ALJ did not err in failing to discuss the testimony of the claimant's wife, as testimony was redundant of claimant's testimony).

## **CONCLUSION**

For the reasons set forth above, the Court **REVERSES AND REMANDS** this case for further proceedings consistent with this decision.

SO ORDERED: 08/13/2010

*William T Lawrence*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification